Charles C. OWEN *v.* Tom DALTON, City Manager and the City of Little Rock

88-190                                      757 S.W.2d 921

Supreme Court of Arkansas
Opinion delivered September 28, 1988

*Rose Law Firm, A Professional Association,* by: *Webb Hubbell,* for appellant.

*Office of the City Attorney,* by: *Mark Stodola* and *Thomas M. Carpenter,* for appellees.

JACK HOLT, JR., Chief Justice. The appellant, Charles C. Owen, a resident and taxpayer of Little Rock, brought suit against the appellee and its city manager to enjoin implementation of Little Rock Ordinance No. 15.311, primarily on the grounds that the Act pursuant to which the ordinance was adopted constituted special or local legislation in violation of Amendment 14 of the Arkansas Constitution. The ordinance provides for a change in the method of election of Little Rock's seven member board of directors and was adopted pursuant to Act 808 of 1977, as amended by Act 840 of 1987. The only issue on appeal is the correctness of the trial court's determination that Act 808, as amended, was not special or local legislation.

As we are unable to discover a purpose for the legislation, as written, which would bear some reasonable relationship to certain exemptions contained in the Act, we conclude that the legislation violates Amendment 14 and is therefore unconstitutional. Accordingly, we reverse.

The stated purpose of the legislation was to strengthen municipal government in this state by requiring that a majority of the members of the governing boards of cities of the first and second class be elected from single member districts having a substantially equal population. Section 2 of Act 808 generally provides that if the governing board of a city consists, for

example, of seven members, four members shall be elected by ward or district, and three members shall be elected at large with the candidate in "position one" becoming mayor.

Prior to the suit by Owen, the seven member board of directors of Little Rock had been elected at large. In an effort to change the method of election for directors in Little Rock to that provided for by the Act, the board, pursuant to section 5 of Act 808, as amended by Act 840 of 1987, adopted an ordinance whereby a majority of the members of the board would be elected by ward or district; the remaining members were to be elected at large with position one being reserved for the mayoral candidate.

The pivotal part of the amended Act 808 is section 5, which provides:

> The provisions of [this Act] *shall not* be applicable to any city in the state having a manager form of government and having a population of thirty thousand (30,000) or more persons, *unless* the city by ordinance of the governing body thereof chooses to be subject to this section. However, any such city may, by ordinance of the governing body thereof approved by a majority of the qualified electors of the city voting on the question, choose to elect all of the members of the governing body of the city from single member districts. [Emphasis ours.]

Prior to Act 840, section 5 did not provide for the adoption of an ordinance whereby the governing body of a particular city could choose to become subject to the Act, and the relevant population figure was 100,000 or more persons.

At the trial level, Owen's efforts to enjoin implementation of the city's new ordinance were based in large part upon the argument that Act 808, as amended, constitutes special or local legislation by virtue of "exemptions" such as the one created by section 5. We agree with the argument.

The Act carves out so many exceptions that its general purpose has become an empty statement. First, all cities with a population of less than 15,000 are excluded; that means most cities in Arkansas. The Act is then made applicable to all cities between 15,000 and 15,999, but not to cities with populations between 16,000 and 16,700. Cities located in counties with less

than 34,000 people are excluded, as are cities whose form of government was established pursuant to Act 498 of 1973. As it stands after the amendment in 1987, two cities for certain, Little Rock and Hot Springs, with a city manager form of government and populations of over 30,000 have the option of being exempt from the Act or passing an ordinance like the one in question.

Amendment 14 provides that the "General Assembly shall not pass any local or special act." An act is special if by some inherent limitation or classification it arbitrarily separates some person, place, or thing from those upon which, but for such separation, it would operate, and the legislation is local if it applies to any division or subdivision of the state less than the whole. *Board of Trustees for Little Rock Police Pension Fund v. City of Little Rock*, 295 Ark. 585, 750 S.W.2d 950 (1988).

While it is true that "statutes are presumed to be framed in accordance with the Constitution, and should not be held invalid for repugnance thereto unless such conflict is clear and unmistakable," *Board of Trustees of Municipal Judges and Clerks Fund, City of Little Rock v. Beard*, 273 Ark. 423, 620 S.W.2d 295 (1981), we have made it clear that we are not bound by the form of the legislation. That is, simply because the legislature states that an act is general in application, we are not bound by that statement. Rather, we look to the operation and effect of the legislation. If that operation and effect is necessarily local, then the act is local regardless of its form. *Ark-Ash Lumber Co. v. Pride*, 162 Ark. 235, 258 S.W. 335 (1924). As we said in *Simpson v. Matthews*, 184 Ark. 213, 40 S.W.2d 991 (1931), if the legislature is to decide whether an act is local or special legislation, then Amendment 14 serves no purpose, and it might just as well not have been adopted.

The controlling question before us is whether the limitations or classifications in Act 808, as amended, bear a reasonable relation to the purpose of the law. *Lovell v. Democratic Central Committee*, 230 Ark. 811, 327 S.W.2d 387 (1959). In that regard, if the classifications are such that the legislation applies only to political subdivisions of a certain population, the legislation is local if relative population has nothing to do with the subject-matter of the law. *Mankin v. Dean*, 228 Ark. 752, 310 S.W.2d 477 (1958); *State ex rel. Burrow v.*

*Jolly,* 207 Ark. 515, 181 S.W.2d 479 (1944). A review of some of our previous opinions sheds ample light on the subject.

In *Simpson, supra,* an act applied only to counties with a population of over 75,000. At the time that could only apply to Pulaski County, and we quickly pointed out to the legislature that Amendment 14 could not be circumvented merely by classification on the basis of population. We said:

> Judging from much recent legislation in this State, it would seem that the impression is prevalent that because classification on the basis of population may be proper for the purposes of legislation on certain subjects, therefore any classification on the basis of population is appropriate for the purposes of legislation on any subject. The sooner the minds of legislators and others are disabused of this erroneous impression, the better; for under any such rule the provisions of the Constitution against special legislation would become wholly nugatory. If it is permissible to adopt for any and all purposes a classification founded upon any and every arbitrary and illusive basis of population, we might have as many acts, general in form, but special in fact, as there are counties, cities, villages, townships, wards, and school districts in the State.

In *Knoop* v. *City of Little Rock,* 277 Ark. 13, 638 S.W.2d 670 (1982), this court held that Act 539 of 1981 constituted special legislation which contravened Amendment 14. Act 539 basically provided that in the 1982 general election cities having a population of 100,000 or more and a city manager form of government must directly elect the mayor by a majority vote. The Act further provided that each director in such cities would be elected by a majority vote with runoff elections, if necessary, held two weeks after the general election. Act 539 clearly would have applied only to the city of Little Rock.

The Act was special legislation because in the absence of some reasonable statutory difference in the powers or functions of the mayors of cities of different sizes, we could not, although the act was accorded presumptive validity, find any reasonable basis for granting to one city but not others the power of directly electing its mayor and holding runoff elections for the positions of mayor and city directors two weeks after the general election.

In *Knoop*, we found significant the following language from our decision in *Street Improvement Districts Nos. 481 and 485* v. *Hadfield*, 184 Ark. 598, 43 S.W.2d 62 (1931):

> The general rule is that classification is properly based on population when reasonably adapted to the subject of the statute. Otherwise the classification by population is special legislation . . . .
>
> The authorities generally hold that classification of cities and towns by population can not be arbitrarily adopted as a ground for granting some of them powers denied others if, although there be a difference in population, there is no difference in situation or circumstances of the municipalities placed in the different classes, and the difference in population has no reasonable relation to the purposes and object to be attained by the statute.

In the case at bar, we are offered no rational basis for the plethora of classifications. Fair and adequate representation, if that is the concern of the Act, by district rather than by election at large, is not different merely because a city reaches a population of 30,000 inhabitants. Furthermore, the Act is a passel of contradictions and typical of legislation that is based purely on selective application. Act 808 mandates compliance by certain classes of cities, exempts others, and gives several cities the option to either come under the Act or to remain exempt. Even though the theme of the Act may be to provide fair and adequate representation, arbitrariness remains.

It is strongly argued that the legislature may well have concluded that fair and adequate representation of inevitably divergent views in cities with a manager form of government and populations in excess of 30,000 could best be accomplished by vesting these cities with the options now embodied in section 5. However, we find the distinction and treatment between cities of less than 30,000 and those above that figure to be wholly untenable, especially in light of the remaining classifications contained in the Act. The fact that the legislation on its face exempts cities such as Little Rock from the operations of the Act refutes any alleged purpose of fair representation where larger cities are concerned. Notwithstanding the legislature's obvious attempt to amend the deficiencies contained in the original Act by

permitting larger cities various options, a rational basis cannot be found for treating cities so differently on such a fundamental matter as the election of directors.

In this case we began with the presumption that the legislation at issue was framed in accordance with the constitution. In the past, when an act contained classifications such that the legislation applied only to political subdivisions of a certain population, we diligently attempted to discover whether relative population had anything to do with the subject-matter of the law, i.e., whether there was a rational relationship between the purpose of the legislation and the population based classifications or exemptions. We have undertaken the same search here but to no avail.

It would have been helpful in making this determination if the legislation, Act 808, contained any information reflecting such a relationship or if we had evidence available to prove that fact — such as legislative history. However, such is not the case. Despite our diligent attempt to determine if a rational basis exists as to the legislation before us, we find none.

In light of the foregoing, we conclude that Act 808 of 1977, as amended by Act 840 of 1987, violates Amendment 14 and is therefore unconstitutional. In accordance with the provisions of Rule 22 of the Rules of the Supreme Court and the Court of Appeals, the mandate is ordered to be issued at the time this opinion is handed down.

Reversed.

PURTLE and GLAZE, JJ., concur.

DUDLEY, HAYS, and NEWBERN, JJ., dissent.

JOHN I. PURTLE, Justice, concurring. I concur in the reasoning and result reached in the majority opinion. However, I concur to implore the General Assembly to resist future pressure to enact special and local legislation. It is not basically the fault of the General Assembly that such legislation is enacted. It is more the fault of special interest groups because it is they who generally initiate such special and local legislation through their lobbying efforts. However, the General Assembly can stop this practice by rejecting such proposals.

If the members of the legislature would simply refuse to consider such bills, it would save much of their time and a great deal of the taxpayers' money. The people still retain the constitutional right to initiate and refer matters to the voters for consideration. In my opinion, that is the manner in which changes in local government ought to be handled. What could be more democratic than allowing the people in the counties and cities to control their own affairs to the fullest extent possible?

I had intended to end this concurrence with the two paragraphs above. After rereading the majority opinion and the concurring and dissenting opinions, I am compelled to add to my concurrence.

On October 5, 1926, the people of Arkansas voted 80,500 to 44,150 to adopt Amendment 14 which simply says:

> The General Assembly shall not pass any local or special act. This amendment shall not prohibit the repeal of local or special acts.

Slightly more than two years later this court was called upon to interpret this amendment and declare an act of the General Assembly unconstitutional. In the case of *Webb* v. *Adams*, 180 Ark. 713, 23 S.W.2d 617 (1929), this court reviewed the history and purpose of Amendment 14. This court stated in *Webb* that the legislature had so disregarded the power to enact local legislation that the people took it upon themselves to remedy the situation. The court, speaking of the reason for enactment of Amendment 14 stated:

> Numerous measures were enacted in all sessions of the General Assembly, general in their terms and nature, and from the operation of which from one or more of the counties of the state were excepted, and this amendment was adopted to remedy the evil, and the power of the General Assembly to enact local or special legislation was withdrawn, the General Assembly being prohibited by its terms from passing any local or special act.

The *Webb* case concerned a general sounding act that had been passed by the General Assembly applying to all of the counties in Arkansas. However, there was a provision which stated: "The provisions of this act shall in no way apply to or affect Gosnell

Special School District in Mississippi County, Arkansas; provided, also, that the provisions of this bill shall not apply to Faulkner and Sharp Counties."

The opinion in the *Webb* case contained a sentence which could not be improved upon for the opinion in the present case. The first sentence of the opinion by Justice Kirby stated: "The act appears, from its title indicating the purpose and its terms, to be general . . . ." The opinion continued by stating:

> Amendment No. 17 [sic] reads: "The General Assembly shall not pass any local or special act. This amendment shall not prohibit the repeal of local or special acts." The language of the amendment is plain and unambiguous, and its meaning clear, disclosing the intention of the people in adopting it, and dispensing with the necessity of seeking other aids for its interpretation. The restrictive provisions of the constitution on the legislative power relative to the passing of local or special legislation, leaving its exercise to the discretion of the Legislature, had been so disregarded and abused as to create an intolerable condition.

The court went on to hold that the act of the legislature excepting the Gosnell Special School District and Faulkner and Sharp Counties from it rendered it special legislation and thereby invalid. The *Webb* opinion was so well written and so clearly reasonable that I again quote from it as follows:

> If two counties and a special school district can be excepted from the provisions of a law otherwise general and operative equally and uniformly throughout the whole state, there would be no reason to say that twenty-five or fifty counties or seventy-four of the seventy-five counties of the State could be so excepted, leaving its application as a general law to but one county, abrogating by legislative determination and judicial construction the Constitutional Amendment prohibiting the Legislature from passing "any local or special act." The exclusion of a single county from the operation of the law makes it local, and it cannot be both a general and a local statute.

Two years later this court decided the case of *Simpson* v. *Matthews*, 184 Ark. 213, 40 S.W.2d 991 (1931). The act of the

legislature under attack in the Simpson case applied to "counties which now are or hereafter may have a population of 75,000 inhabitants according to the last federal *census*." There, as here, the act applied only to Pulaski County. The *Simpson* opinion clearly stated that classifications of counties and municipalities, according to population, might be reasonable, but to do so it must bear a reasonable relation to the subject of the legislation. The opinion was careful to point out that there must be something more than mere designation by population before such classification may be considered valid. The court stated:

> The marks of distinction on which the classification is founded must be such, in the nature of things, as well, in some reasonable degree at least, account for or justify the restriction of the legislation.

Our opinions up until this time have generally held that the conditions attached to legislation must act uniformly upon all of its class and all of the conditions should be appropriate to accomplish the purpose for which the legislation was enacted. Much special legislation has been passed even after the people adopted Amendment 14. The *Simpson* opinion stated:

> Judging from much recent legislation in this State, it would seem that the impression is prevalent that because classification on the basis of population may be proper for the purposes of legislation on certain subjects, therefore any classification on the basis of population is appropriate for the purpose of legislation on any subject. The sooner the minds of legislators and others are disabused of this erroneous impression, the better; for under any such rule the provisions of the Constitution against special legislation would become wholly nugatory. If it is permissible to adopt for any and all purposes a classification founded upon any and every arbitrary and illusive basis of population, we might have as many acts, general in form, but special in fact, as there are counties, cities, villages, townships, wards, and school districts in the State.

This court again considered a special act in the case of *Humphrey, State Auditor* v. *Thompson*, 222 Ark. 884, 263 S.W.2d 716 (1954). There we held that Amendment 14 was intended to prevent arbitrary classifications based upon no

reasonable relation between the population and the subject matter of the act. Again, the court repeated that this court will look to the substance or practical operation of an act rather than to its title and form in considering its real operation. The act in question in the *Humphrey* case applied only to counties having a population of less than 6,000. Only Perry County met this distinction. Justice McFadden, in the *Humphrey* opinion, quoted from *Webb* v. *Adams*, supra, as follows:

> The exclusion of a single county from the operation of the law makes it local, and it cannot be both a general and a local statute . . . . The courts look to the substance and practical operation of a law in determining whether it is general, special or local, and if its operation must necessarily be special or local, it must be held to be special or local legislation, whatever may be its form. . . . A local law is one that applies to any subdivision or subdivisions of the State less than the whole. . . . A law is special in a constitutional sense when, by force of an inherent limitation, it arbitrarily separates some person, place or thing, those upon which, but for such separation, it would operate.

One of the basic facts in the *Humphrey* case was highlighted by the following questions and answers from a witness which are stated as follows:

> QUESTION: Would you know of any reason why that differential in population would make Perry County need a vocational school more than Montgomery County?
>
> ANSWER: None.
>
> QUESTION: And there would be no reason for Perry County having any special need over these counties that have a few more population than Perry County?
>
> ANSWER: I wouldn't know of any, no, sir.

Turn these questions around slightly in the present case and ask why Little Rock needs this act more than the others with a different population and the answer is bound to be — there is no reason. There is no reasonable or rational basis for the classification by population of the cities as to the form of government they

have. In the present case population gerrymandering is more conspicuous than was the geographical gerrymandering which caused the revolution in the law known as "one man one vote." All citizens are entitled to be heard on matters concerning their form of government. Allowing only some citizens to be heard will not suffice. Democracy does not start at 16,000 or 100,000.

A law is general when it operates on all counties, cities and towns alike, but it is special when it arbitrarily separates some person, place or thing from those upon which it would apply except for the exception. *Laman* v. *Harrill*, 233 Ark. 967, 349 S.W.2d 814 (1961). The legislation in the *Laman* case applied only to cities having a population over twenty thousand in a county which had a population over fifty thousand. The way it was worded it applied only to the city of North Little Rock. We held the act unconstitutional.

From early times our opinions have all recognized that in making a determination of whether an act is general or special, we look to the substance and practical operation of the legislation rather than its title, form and phraseology. *Burrow* v. *Jolly*, 207 Ark. 515, 181 S.W.2d 479 (1944). We struck down an act of the legislature which attempted to enact a law in counties having a population between 10,275 and 10,290 in the case of *Wilson* v. *State*, 222 Ark. 452, 261 S.W.2d 257 (1953). The present law mimics the population gerrymandering which was found to exist in *Wilson*. Another opinion of this court struck down a law which applied to only one county in a two county judicial district. *Beaumont* v. *Adkisson*, 267 Ark. 511, 593 S.W.2d 11 (1980).

We have likewise struck down an act of the General Assembly applying to counties having a population of 10,200 to 11,000, according to the last federal census. The act applied only to Searcy County. *Hensley* v. *Holder*, 228 Ark. 40, 307 S.W.2d 794 (1957). Another act applying only to Pulaski County was struck down in *City of Little Rock* v. *Campbell*, 223 Ark. 746, 268 S.W.2d 386 (1954). We have also struck down legislation applying to certain municipal employees in counties having a population of over 150,000. *See Special Board of Trustees* v. *Beard*, 273 Ark. 423, 620 S.W.2d 295 (1981).

In my opinion the case of *Knoop, et al.* v. *City of Little Rock*, 277 Ark. 13, 638 S.W.2d 670 (1982), is dispositive of this case.

The legislature had enacted legislation affecting the election of mayor in cities having a population of over 100,000 with the city manager form of government. The act denied the same power to cities having the manager form of government and with populations of less than 100,000. The opinion, written by Justice Frank Holt, properly disposed of the matter in a paragraph which I wish to set out in full:

> The mayor in a city, regardless of its size, having a city manager form of government merely presides at board meetings, is recognized as head of the city government for ceremonial purposes, and signs all written agreements on behalf of the city. § 19-708(b). These powers are not altered in any way by Act 539. They are the same whether the mayor is elected by the directors or by the direct election with a majority vote. In the absence of some reasonable statutory difference in the powers or functions of the mayors of cities of different sizes, we cannot, although the act is accorded presumptive validity, find any reasonable basis for granting to one city but not to others the power of directly electing its mayor and holding runoff elections for the positions of mayor and city directors two weeks after the general election. Consequently, we must hold that Act 539 is special legislation which contravenes Amendment 14. We deem it unnecessary to discuss appellant's additional argument that the act is local legislation.

Another special legislation case was decided by this court in *Ferguson* v. *Brick*, 279 Ark. 288, 652 S.W.2d 1 (1983). In the *Brick* case the legislation purported to apply only to cities having a population between 57,000 and 61,000. It was clearly unconstitutional. Shortly following that we decided the case of *Littleton* v. *Blanton*, 281 Ark. 395, 665 S.W.2d 239 (1984). Special legislation in that case involved creating a municipal court in counties having a population of 26,500 to 28,000. Obviously only one county was affected by the legislation and we unhesitatingly declared it special legislation in violation of Amendment 14.

There are some cases when the population classification has been allowed to stand. In *Lovell* v. *Democratic Central Committee*, 230 Ark. 811, 327 S.W.2d 387 (1959), we allowed a statute to survive which applied to cities of over 50,000 and were governed

by the mayor-council form of government. In my opinion that is as far as this court has ever gone in upholding legislation based upon population. Even so it applied to all cities having a population of more than 50,000 and retaining the democratic form of government.

I cannot believe that the electors of any one city in the state of Arkansas are any smarter than the electors of another city. Neither the geographical size nor the population has any bearing on the intelligence of the citizens nor their right to vote for a representative form of government. It is my opinion that the constitution requires members of the city council or board of directors to be elected by the voters in districts and the mayor to be elected by the voters of the entire city. I see no reasonable basis or legitimate state purpose in classifying cities into separate categories for the purpose of exercising their right to vote for their representatives.

Neither the duties of the mayor nor those of the board of directors would be any different if the present act were upheld. Therefore, the *Knoop* case would clearly require that the legislation be held invalid. Since there is no reasonable purpose in using population as the basis for this type of gerrymandering, if this legislation is upheld, it must qualify on some other ground. The only other possible argument supporting this legislation is that it creates equality among the voters by giving the black residents of Little Rock an opportunity to vote on certain positions. If that is the case why not give them more opportunity and allow all of the directors to be elected by district.

The parties to this action have again waited until the last minute to appeal, thereby forcing this court to hurriedly dispatch its opinion. This same situation repeats itself every two years. Therefore, it is no wonder that our opinions are not unanimous. It is time that we return to fundamental constitutional precepts.

Tom Glaze, Justice, concurring. Relying on longstanding precedent, the appellees correctly state the legal issue before us as follows: Whether the General Assembly could have had a rational basis for the classifications contained in Act 808 of 1977 as amended by Act 840 of 1987 (hereinafter Act 840). Even the appellees concede a couple of the classifications are constitutionally suspect, but it suggests those categories could be severed,

thus not affecting the constitutionality of the remaining and basic portion of the Act.[1] Unfortunately, even if the court severed the provisions the appellees concede are special legislation, the remaining basic scheme or classifications for electing directors and mayors in city management governments still want for logic and reason. Those remaining classifications by methods of selection are three-fold and appear as follows:

| Population | Method of Selection |
|---|---|
| 1. up to 15,000 | Directors: all at-large<br>Mayor: Appointed by Board |
| 2. 15,000 to 29,999 | Directors: Majority by district; balance at-large<br>Mayor: Elected by people |
| 3. above 30,000 (1) | Directors: All at-large |
| (2) | Directors: Majority by district; balance at-large<br>Mayor: Elected by people |
| (3) | Directors: All by district<br>Mayor: Appointed by Board |

When viewing the above three separate groups of cities with manager forms of government, let us attempt to assign a reason for their respective classifications and different methods by which each group selects directors and mayors. Appellees suggest that cities that have a population of under 15,000 may be small enough that the peoples' interests are similar in nature or kind so as to negate any significant value in having directors elected by single-member districts. Following such logic, one could further conclude that city governments, with a population of over 15,000 to 30,000 (the second group above), have grown to a point where the geographic needs and interests of the people warrant their directors to be elected by districts. That being so, the General Assembly's enactment of Act 840 is reasonable since it requires single-member districts in the second group or class of cities.

---

[1] One provision of Act 840 exempted cities with a population of between 16,000 and 16,700, which applied only to Benton, Arkansas. Another one exempted governments formed under Act 498 of 1973, which included only Fayetteville.

When, however, we review the third group — cities over 30,000 — we find single-member districts are *not* required. Instead, these larger class cities have an *option* to select their directors either at large *or* by district.

Why more populous cities should have an option to elect directors at-large when the smaller, second group of cities has no such option is truly puzzling. In fact, based upon the logic that cities become less homogeneous as they become larger, the rationale for single-member districts in cities over 30,000 is necessarily the same for those size cities that fall within the 15,000 to 30,000 classification. No reason exists for the disparate treatment given these two classifications of larger Arkansas cities by Act 840. To make any sense, both larger groups of cities should be permitted either the option to elect directors at large or by district or they both should be required — with no options available — to elect their directors by districts. As Act 840 presently reads, these classification provisions are inseverable and therefore constitutionally unsalvageable.

In sum, I agree with the result reached by the majority but do so because the classifications contained in Act 840 are inconsistent and provide no rational basis to the purpose of the law, *viz.*, to assign a method by population of selecting directors by districts or at large for different sized cities with a city manager form of government.[2] *See Board of Trustees for Little Rock Police Pension Fund* v. *City of Little Rock*, 295 Ark. 585, 750 S.W.2d 950 (1988); *Lovell* v. *Democratic Central Comm.*, 230 Ark. 811, 327 S.W.2d 387 (1959); *Knowlton* v. *Walton*, 189 Ark. 901, 75 S.W.2d 811 (1934). Act 840 offends amendment 14 to the Arkansas Constitution as that amendment has been interpreted by longstanding precedent; for that reason alone, I feel Act 840 must fall under amendment 14 to the Arkansas Constitution.

Justice Newbern's dissent suggests the majority decision overrules *Streight* v. *Ragland*, 280 Ark. 206, 655 S.W.2d 459 (1983). He cites *Streight* for the proposition that it is the duty of the party challenging the constitutionality of legislation to demonstrate it could have no rational basis. Of course, that rule

---

[2] Although not fully discussed, the selection of mayoral positions also varies dependent upon the classification and size.

was adopted by this court many decades before *Streight*, and the majority opinion, without citing *Streight*, specifically acknowledges that rule. Unquestionably, the presumption is in favor of the constitutionality of any legislation passed by the General Assembly. That presumption cannot prevail, however, when there is no rational basis to support the arbitrary classification given Arkansas cities under Act 840. Newbern's reference to affluent and less affluent districts and media expense for campaigning in no way addresses the disparate treatment given the three classifications of cities, as I have attempted to discuss above.

Justice Hays's dissent, on the other hand, attempts to sustain Act 840's constitutionality by propping it up with the "one man-one vote" rule announced in *Reynolds* v. *Sims*, 377 U.S. 533 (1964). Act 840 may be consistent with that rule, and it may not. It could be argued even cities under 15,000 should have single-member districts. It also could be contended that cities over 30,000 must have single-member districts and an option to allow at-large directors is unconstitutional. Those issues and arguments simply are not before us. The only question in this appeal is a state issue, *viz.*, whether Act 840 contravenes amendment 14 to the Arkansas Constitution, *i.e.*, whether the act is special or local legislation.

STEELE HAYS, Justice, dissenting. While I share the majority's concern that this legislation is difficult to reconcile with Amendment 14, nevertheless, I believe a rational basis can be found in the self-evident intent of the enactments to promote greater compliance with the "one man, one vote" rule. That objective is both rational and mandatory. *Reynolds* v. *Sims*, 377 U.S. 533 (1964); *Avery* v. *Midland County*, 390 U.S. 474 (1967); *Baker* v. *Carr*, 369 U.S. 186 (1961).

The majority largely ignores the spirit of Act 840 and the higher principle to which it points, i.e. the general rule of law of "one man, one vote." This general principle of law pervades Act 840, however, on closer examination, the exceptions carved out in this Act while appearing to make this legislation special or local, demonstrate an effort to provide these exceptions with the same opportunity to achieve the "one man, one vote" principle. The general overriding intent of Act 840 is to provide a system of

electing a city's officials which more closely promotes the "one man, one vote" rule. The exemptions that trouble the majority are aimed at providing for a more representative election by districts or wards.

Act 840 applies only to the city management form of government. All other forms of local government provide for a seemingly "one man, one vote" principle. For example, the mayor-council form of government provides for the selection of alderman from districts. Ark. Code Ann. § 14-43-307 (1987). Additionally, the city administered governments provide for a selection of a majority of the directors by district and the direct election of the mayor. Ark. Code Ann. § 14-48-110 (1987). As to the commission form of government, because only three commissioners are elected there is little reason to distinguish by districts and at large.

The classification by population simply ensures that the cities of Little Rock and Hot Springs, and potentially seven other cities should they elect a city management form of government, have the opportunity to afford their citizenry the option to enact an ordinance providing for more representative city government.

I would affirm the trial court.

DAVID NEWBERN, Justice, dissenting. We presume legislation to be not unconstitutional, we are permitted to speculate as to a rational basis for legislation, and we defer to the general assembly's institutional ability and responsibility to determine the need for any particular law. These three principles have been stated often by this court. They were all restated and more than adequately supported in *Streight* v. *Ragland*, 280 Ark. 206, 655 S.W.2d 459 (1983), where this court, in a very thorough opinion by Special Justice W.W. Bassett, Jr., made it clear that it is the duty of the party challenging the constitutionality of legislation to demonstrate that it could have no rational basis. That has not been accomplished in this case.

The classifications of cities under 30,000 population may or may not be unconstitutional. The question here is whether it constitutes local legislation to permit the upper classification, which includes the City of Little Rock, to choose a method of elections combining representation of wards with representation

at large. My speculation is that the general assembly passed this law because its members knew that in larger cities representatives may come from only more affluent districts whose candidates can better afford expensive media for campaigning. The law permits a city to choose to allow its less affluent, and previously less influential, citizens to have a voice in government.

By overruling *Streight* v. *Ragland, supra,* and its predecessors we will shift the burden to the general assembly to justify its every act. It may seem laudable to remove a requirement that a party challenging legislation meet the difficult burden of "proving a negative," but that burden has not been insurmountable in the past. We have been willing to declare legislation "special" or "local" in violation of Amendment 14 where we have been unable to find any redeeming rationality. *See, e.g., Lawson* v. *City of Mammoth Spring,* 287 Ark. 12, 696 S.W.2d 712 (1985); *Arkansas Commerce Comm.* v. *Arkansas & Ozarks Ry.,* 235 Ark. 89, 357 S.W.2d 295 (1962); *Board of Trustees* v. *Pulaski Co.,* 229 Ark. 370, 315 S.W.2d 879 (1958). While we have not stated the burden of proof in each of these cases, it seems to me we have clearly placed it upon the challenger. Now, virtually every piece of legislation involving the inevitable need for classifications will be subject to easy challenge because the burden will apparently be on the general assembly to have announced its rationale or upon the party supporting the legislation in question to know what it is through some as yet unknown process.

The duty of this court in our constitutional framework is to serve as a check on the legislative branch of government. That should mean, as it has until now, that we should intercede only when the general assembly has demonstrably overstepped the constitutional boundary. Until now, we have maintained our proper role by requiring the party challenging legislation to be the demonstrator. Judicial restraint should operate against the majority's decision in two ways: we should not abandon our cases in this instance, and we should not tilt the delicate constitutional balance among our institutions.

I respectfully dissent.

DUDLEY, J., joins in this opinion.